NOT FOR PUBLICATION

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY**

| | FILED |
|---|---|
| | JAMES J. WALDRON, CLERK |
| | [JULY 18, 2012] |
| | U.S. BANKRUPTCY COURT CAMDEN, N.J. |
| | BY: Christopher Fowler, Deputy |

```
                                          :
IN RE:                                    :   CHAPTER 13
                                          :
  KELLI McHUGH,                           :   CASE NO.  11-14612 (GMB)
                                          :
                    Debtor.               :
                                          :
                                          :
JOHN and CAROLYN OLIVA,                   :   ADVERSARY NO. 11-1802 (GMB)
                                          :
                    Plaintiffs,           :
                                          :
      v.                                  :
                                          :
KELLI McHUGH,                             :   MEMORANDUM OPINION
                                          :
                    Defendant.            :
                                          :
```

APPEARANCES

YooNieh Ahn, Esquire
Jacobs & Barbone, P.A.
1125 Pacific Avenue
Atlantic City, NJ  08401
Counsel for Plaintiffs

Joseph M. Pinto, Esquire
Polino & Pinto, P.C.
Moorestown Times Square
720 E. Main Street, Suite 1C
Moorestown, NJ  08057
Counsel for Debtor/Defendant

I.  **INTRODUCTION**

In this adversary proceeding, John and Carolyn Oliva (the "Plaintiffs") objected to the dischargeability of an unliquidated and undetermined sum allegedly owed by Kelli McHugh, (the "Debtor") pursuant to 11 U.S.C. § 523(a)(6), for "willful and malicious injury by the debtor to another entity or to the property of another entity," and; § 523(a)(4) for conversion of money while acting in a fiduciary capacity.  The Plaintiffs allege that the debt which is the subject of the § 523(a)(6) claim arose as the result of the suicide of the Plaintiffs' belated son on October 1, 2002 (the "Incident Date").  The parties have conducted discovery and the Debtor now moves for summary judgment seeking dismissal of all counts of Plaintiffs' complaint.  As discussed more fully below, because there are no issues of material fact for trial, this Court will rule in Debtor's favor and grant summary judgment on all counts.

II. **JURISDICTION**

This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1334(a), 28 U.S.C. §157(a) and Standing Order of Reference from the United States District Court for the District of New Jersey dated July 23, 1984.  A determination as to the dischargeability of a debt is a core proceeding under 28 U.S.C. §157(b)(2)(i).[1]

---

[1] While the parties have not challenged the Court's subject matter jurisdiction to hear the within matter, we nevertheless feel it important to briefly address the jurisdictional aspect of this case, as the Plaintiffs' Complaint states that the nondischargeability is premised upon a claim for "wrongful death." 28 U.S.C. §157(b)(2)(B) provides in pertinent part:

> Core proceedings include, but are not limited to – allowance or disallowance of claims against the estate … and estimation of claims or interest for the purposes of confirming a plan under chapters 11, 12, or 13 of title 11 *but not the liquidation or estimation of* contingent or unliquidated personal injury, tort, or *wrongful death claims against the estate for purposes of distribution in a case under title 11*.

11 U.S.C. §157(b) (emphasis added).  As evidenced in the language of §157(b)(2), there is a distinction between the determination of nondischargeability and the allowance/disallowance of claims process in a bankruptcy case.  In this case, the Court is only determining the dischargeability of the claim pursuant to §523(a)(6).  If Plaintiffs had alleged a claim for relief in this adversary proceeding for liquidation and allowance against the bankruptcy estate of their wrongful death claim, then that claim for relief would not be core and would need to be tried by the district court.  Furthermore, if this Court were to determine that there were genuine issues of material fact that necessitated a trial, then the case would be tried by the district court. 28 U.S.C. §157(b)(5).  Such a claim for relief, however, is separate and distinct from the only claim made in Plaintiffs' complaint – a claim for relief for determination of dischargeability under 11 U.S.C. §523(a)(6).  This Court has accepted as true all allegations made by Plaintiffs and has viewed the facts in a light most favorable to Plaintiffs' case, yet still concludes that the Plaintiffs have failed to state a claim against Debtor.

**III.    BACKGROUND**

Debtor was the live-in girlfriend of John Oliva (hereinafter "Oliva" or "Decedent") from sometime in 2000 up and until Oliva's death. Both Debtor and Oliva served as police officers in the State of New Jersey. Plaintiffs allege that approximately three months after Debtor and Decedent began their relationship, Oliva cut ties to the Plaintiffs, both physically and emotionally. Plaintiffs also allege that in or around 2001, Oliva filed a new designation of beneficiary form which named the Debtor as beneficiary of any life insurance proceeds and/or pension funds on account of Oliva. Prior to that change, the Plaintiffs had been designated as beneficiaries. At the same time in 2001, Debtor also changed her designation of beneficiary form and designated the Decedent as her beneficiary, with her children being contingent beneficiaries behind Oliva.

In or around September 2002, the Decedent was suffering physical deterioration and manifested a deepening depression. During this time, Oliva required medication and mental health care by professionals, which he received. The Plaintiffs allege that the primary causes of Oliva's deepening depression were Oliva's deteriorating work situation and his relationship with the Debtor. On or about September 17, 2002, Oliva was told that he would never return to his position as a New Jersey State police officer. Debtor was aware of Oliva's depression and his regimen of psychiatric care, including the fact that Oliva was taking prescription medications. Plaintiffs also allege that the Debtor was aware that there were guns and ammunition within the family home. Despite knowing of Oliva's deepening depression, Debtor never removed the guns or ammunition from the home. Plaintiffs further allege that Debtor, as a municipal police officer, received training in approaching, dealing with and caring for the mentally ill and/or those in crisis.

On September 27, 2002, Oliva verbalized to Debtor that he was contemplating taking his own life. Plaintiffs allege that Debtor did not report any of Oliva's behavior or his mention of suicide to the Plaintiffs or to Oliva's treating physicians. As indicated by the police report, at approximately 10:36 a.m. on October 1, 2002 the police were dispatched to St. Elizabeth Ann Seton Roman Catholic Church in Absecon New Jersey. See Doc. 10-1, Case No. 11-01802, pg. 37, Absecon Police Incident Report #P02016951. It was at the side lawn of this church that Oliva took his own life. Decedent was pronounced dead at approximately 11:16 a.m.

The investigative report indicates that the officers assigned to investigate the suicide immediately went to the home of the Debtor and Decedent, where they found two notes from Decedent to Debtor, with one expressing his love and affection for the Debtor, and the other indicating that he had placed his financial affairs in order and indicating that he was leaving all of his assets to her.  See Doc. 10-1, Case No. 11-01802, p. 42, *Supplemental Investigative Report dated 10/1/2002*.  The investigative report also indicated that the Decedent had visited with another police officer - Officer Perry - the previous evening until about midnight or 12:30 a.m. on the morning of the incident.  Officer Perry told the investigative officer that Decedent had acted very paranoid, making comments about his phone being bugged and thinking that he was a target of the state police.

The Atlantic County Prosecutor's Office's Initial Report indicates that Debtor was informed of Decedent's death at approximately 12:45 p.m. and that she was transported to her home by two officers from the Ventnor Police Department.  See Doc. 10-1, Case No. 11-08102, pg. 44-49.  The Atlantic County Prosecutor's Office report also indicates that Oliva, Decedent's father and Plaintiff herein, was interviewed by the detectives after the Incident.  Id.  Plaintiff indicated to the detectives that he had received a phone call from Decedent on September 29, 2002, and that he also briefly spoke with him on September 30, 2002, just days before the suicide.  Id.

Immediately after Decedent's death, on or about October 18, 2002, the Plaintiffs, through counsel, wrote to the New Jersey Division of Pensions and objected to the release of any State benefits to the Debtor.  The Plaintiffs claimed that the Decedent did not have the mental capacity to change his beneficiary form from Plaintiffs to Debtor. On October 21, 2002, the Plaintiffs filed complaints to be appointed as administrators of Decedent's estate.  Prudential Insurance Company, the holder of the Decedent's life insurance policy, would not release any insurance proceeds to the Debtor as a result of the dispute and so the parties agreed to litigate the right to the benefits in State Court.  Over two years later, on May 28, 2004, the State Court entered an Order granting partial summary judgment in favor of Debtor and dismissing the Plaintiffs' claim regarding the Decedent's lack of testamentary capacity.  As a result of the judgment, Debtor was entitled to receipt of the State life insurance and pension benefits.  The court reserved decision on the issue of undue influence in the execution of Decedent's will and asked Plaintiffs to

4

supplement the record because, up to that point in the litigation, "there [was] nothing in th[e] record which would provide direct evidence, either circumstantially or directly, that undue influence was exerted."  See Doc. 10-1, Case No. 11-01802, pg. 22, ¶¶9-15.

Debtor and the Plaintiffs subsequently reached a settlement on the Plaintiffs' remaining "undue influence" claim which provided that "[a]ll claims which plaintiffs have against Kelli McHugh and the Estate of John Oliva are withdrawn, released and relinquished except for those dealing with counsel fees …"  See Doc. 10-1 Case No. 11-01802, pg. 12-18.  Also as part of the settlement, Debtor agreed to return specific items of Decedent's personal property to the Plaintiffs.  The Plaintiffs subsequently moved to recover over $60,000 in counsel fees from Debtor.  The Superior Court Judge initially granted the Plaintiffs' counsel fees in the amount of $17,500, but after Debtor moved for reconsideration, the judge reduced the Plaintiffs' award of counsel fees to $17,000.  The Debtor appealed the ruling with respect to counsel fees.  While the appeal was pending, the Debtor contends that her attorney, Stephen Hiltebrand, was entrusted to hold a $17,000 "trust check" pending the outcome of the appeal.  On August 25, 2011, after the Debtor filed the instant petition and after the Plaintiffs commenced this adversary proceeding, the Appellate Division of the Superior Court of New Jersey issued an order vacating the award of counsel fees in favor of the Plaintiffs.  See Sup. Ct. App. Div. Docket  No. A-2906-04T2, August 25, 2011.

The Debtor filed her voluntary chapter 7 petition on February 18, 2011.  The Plaintiffs filed the within adversary case on May 16, 2011.  Debtor filed her answer to the complaint on May 26, 2011, and a Joint Order Scheduling Pretrial Proceedings and Trial was entered on June 2, 2011.  The Debtor filed the instant Motion for Summary Judgment on January 4, 2012, to which the Plaintiffs filed opposition on February 3, 2012.  It is significant to note that the Plaintiffs did not respond to the Debtor's Motion for Summary Judgment with respect to the §523(a)(4) claim regarding the $17,000 in counsel fees.  In light of the fact that the $17,000 award of counsel fees in the State Court litigation was vacated, and in light of the fact that the Plaintiffs failed to address this point in their opposition to the Motion for Summary Judgment, this Court will consider Plaintiffs' Count II under §523(a)(4) to have been abandoned by Plaintiffs.

5

A hearing was held on the Motion for Summary Judgment on February 14, 2012, and the matter was taken under advisement.

## IV. DISCUSSION

### A. Standard

In order to prevail on a motion for summary judgment, the movant must meet the statutory criteria set forth in Rule 56 of the Federal Rules of Civil Procedure, made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7056. Pursuant to Rule 56(c), summary judgment should be granted to the moving party if the Court determines that the "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317 (1986) (*quoting* Fed. R. Civ. P. 56(c)). A movant has the initial burden of establishing that there exists any genuine issue of material fact. Id. at 322-23.

In determining whether a genuine issue of material fact exists, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). *See also* Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) ("'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party,' there is no genuine issue of fact for trial and summary judgment is appropriate.").

When a nonmoving party relies upon an affidavit in opposing summary judgment, the affidavit is not sufficient to defeat summary judgment when it fails to aver "specific facts which are admissible at trial" and relies solely upon "conclusory statements, hearsay statements, or unfounded declarations." Regan v. Estate Questa Verde, 48 V.I. 612, 2006 WL 3613280, at *5 (D. V.I. 2006). Averments in an affidavit that are contradicted by documentary evidence are insufficient to create a genuine issue of material fact. Murray v. IBEW Local Union No. 98 Pension Plan, 2011 U.S. Dist. LEXIS 53284, 2011 WL 1883168, at *4 (E.D. Pa. May 17, 2011).

In addition, the entry of summary judgment is appropriate if, upon motion and after adequate time for discovery, the party against whom the motion for summary judgment is filed fails to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, (1986).  As the Supreme Court stated in Celotex Corp.:

> In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

Id. at 322-23.

In the instant case, there is a complete failure of proof on the Plaintiffs' part concerning essential elements of their §523(a)(6) case, which necessarily renders all other facts immaterial. As Plaintiffs have failed to make a sufficient showing on essential elements of their case with respect to which they have the burden of proof, the Debtor is entitled to judgment as a matter of law.

**B.    Section 523(a)(6)**

By the instant adversary proceeding, the Plaintiffs seek a determination that any debt owed to the Plaintiffs be held nondischargeable pursuant to § 523(a)(6) of the Bankruptcy Code. In this respect they carry the burden of proof, the standard for which is proof by a preponderance of the evidence.  See Grogan v. Garner, 498 U.S. 279 (1991).  Section 523(a)(6) of the Bankruptcy Code provides in pertinent part that:

> A discharge under section 727… does not discharge an individual debtor from any debt –
>
> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

11 U.S.C. §523(a)(6).

Prior to the enactment of the 1978 Bankruptcy Code, bankruptcy courts found that a non-dischargeable injury arose whenever the debtor's conduct was at least reckless and was done

7

without just cause.  Tinker v. Colwell, 193 U.S. 473 (1904); See In re Conte, 33 F.3d 303, 306 (3d Cir. 1994) (discussing pre-1978 case law).  Subsequent to the 1978 legislation, courts have concluded that Congress intended that section 523(a)(6) should have a higher standard than just recklessness.  In re Conte, 33 F.3d at 306.  Thus, the United States Supreme Court, in Kawaauhau v. Geiger, 523 U.S. 57 (1998), narrowly defined the phrase "willful and malicious" utilized in section 523(a)(6).  The Court construed section 523(a)(6) as limited in scope to intentional torts:

> The word "willful" in (a)(6) modifies the word "injury," indicating that nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury.  Had Congress meant to exempt debts resulting from unintentionally inflicted injuries, it might have described instead "willful acts that cause injury."  Or, Congress might have selected an additional word or words, *i.e.*, "reckless" or "negligent," to modify "injury."  Moreover, as the Eighth Circuit observed, the (a)(6) formulation triggers in the lawyer's mind the category of "intentional torts," as distinguished from negligent or reckless torts.  Intentional torts generally require that the actor intend the "*consequences* of an act," not simply "the act itself."  Restatement (Second) of Torts § 8A, comment *a*, p. 15 (1964).

Id. at 61-62.

Similarly, the Third Circuit Court of Appeals observed in In re Conte:

> [W]hen Congress required more than recklessness for nondischargeability, it required that the debtor have engaged in conduct more culpable than taking a deliberate action that had a high probability of producing harm… Rather, for the injury to have been "willed" by the debtor, it must at least have been substantially certain to result from the debtor's act.

In re Conte, 33 F.3d at 307.  Accordingly, an injury is willful and malicious pursuant to §523(a)(6) "…only if the actor purposefully inflicted the injury or acted with substantial certainty that injury would result."  In re Conte, 33 F.3d at 305.

In this matter, the Plaintiffs allege that Debtor intentionally failed to prevent Decedent's suicide by failing to give notice of his suicidal plan to his family, friends, or his medical/psychiatric physicians, and knew that her actions and/or omissions would cause a severe, certain and imminent risk of death.  The Plaintiffs fail to appreciate the meaning of "willful and malicious" as that term is used in §523(a)(6) of the Code.

Even if this Court accepts as true all allegations made by Plaintiffs, and even if this Court accepts the negative inferences Plaintiffs suggest regarding Debtor's behavior leading up to and immediately after the suicide, this Court concludes that no reasonable fact-finder could find that the Debtor willfully and maliciously facilitated the death of Decedent.  As conceded by Plaintiffs, the Decedent suffered from a severe depression for months leading up to his death; the Decedent was under the care of several medical and/or psychiatric professionals at the time of his death; the Decedent was prescribed psychiatric medications at the time of his death; the Decedent had a strained relationship with his family leading up to the time of his death, and; the Decedent learned of his permanent termination as a New Jersey State Police Officer just prior to his death.  Ultimately, Decedent took his own life with his own weapon and the Plaintiffs have pointed to no conduct by Debtor that proximately caused the death of Decedent.

Plaintiffs make much of the fact that Debtor failed to render aid or other assistance to Decedent prior to his suicide, despite knowing that he was suffering from depression, and claims that this omission constitutes a "willful and malicious" act under the Code.   While Plaintiffs' position is correct that an omission could, in some circumstances, result in a finding of non-dischargeability, it is important to remember that even in such an instance "[t]he meaning of 'willful' under § 523(a)(6) is controlled by the Supreme Court's decision in Kawaauhau v. Geiger . . . Like the *en banc* Eighth Circuit decision it affirmed, the Court relied on the Restatement (Second) of Torts, observing that the [§ 523](a)(6) formulation triggers in the lawyer's mind the category intentional torts . . . "  In re Patch 526 F.3d 1176, 1180 (8th Cir. 2008) (internal quotations omitted).

In the case of Patch, a tragic case from the Eighth Circuit, the representative of her son's estate sued the debtor, Denise Patch, for the wrongful death of her son, Dillon, at the hands of Patch's live-in boyfriend.  Id.  The child was horribly abused and beaten to his death by Patch's boyfriend while Patch stood by and did nothing to prevent the abuse and ultimate death of the child. Id.  The night before Dillon's death, the debtor's boyfriend told debtor that Dillon had fallen and hurt his head. Debtor noticed a large bruise on Dillon's head and that he was having a difficult time speaking and breathing. Id.  She did not seek medical treatment, but put the child to bed with the boyfriend and she slept on the couch. Id.  The next morning Dillon was dead. Id.  The autopsy showed that the child died from multiple blunt force injuries to his head and that he

had suffered acute injuries to almost every part of his body. Id.  The debtor subsequently pled guilty to second-degree manslaughter. Id.  The debtor knew that Dillon had been a victim of abuse for an extended period of time. Id.  Yet she continued to leave Dillon with the boyfriend and she hid the abuse from others by removing Dillon from daycare and speech therapy. Id. Debtor argued that her conduct was mere negligence or recklessness and did not meet the standard for willful and malicious injury under § 523(a)(6). The Eighth Circuit agreed, reversing and remanding the case back to the Eighth Circuit BAP.  See Blocker v. Patch (In re Patch), 356 B.R. 450 (8th Cir. BAP Minn. 2006).  After analyzing the entire record as a whole, the court concluded that it "could not lead a rational trier of fact to find that Patch either desired to bring about Dillon's death as a result of her conduct or was substantially certain that Dillon's death would result from her conduct," and concluded "as a matter of law that Patch's unliquidated debt in the wrongful-death action is not for willful. . . injury." Id. at 1183 (internal quotations omitted).   The debt was deemed dischargeable. Because the court concluded that Patch did not act "willfully," it did not analyze the "malicious" requirement of the statute. See Patch at 1180, n 2.

   Plaintiffs seek to paint a picture of the Debtor as a callous and indifferent woman that made numerous missteps in the days and months leading up to their son's suicide.  The documents, affidavits, sworn testimony and depositions on file, however, fail to put forth even a scintilla of evidence that the Debtor ever acted in a "willful" and/or "malicious" manner.  As noted above, "the (a)(6) formulation triggers "intentional torts," as distinguished from negligent or reckless torts … and [i]ntentional torts generally require that the actor intend the "consequences of an act," not simply "the act itself.""  Kawaauhau v. Geiger, 523 U.S. 57 (1998).  If the devastating and disturbing facts of Patch cannot, as a matter of law, support a finding of non-dischargeability, then certainly the facts alleged herein are woefully deficient.

   The Plaintiffs continue to make much of the fact that the Debtor was the recipient of certain life insurance and pension proceeds and seem to insinuate that this served as a motive for her failure to prevent Decedent's suicide.  As noted above, the Plaintiffs were able to tie-up said proceeds in litigation for over two years after Decedent's death, and the issue of Plaintiffs' attorneys' fees therein was only just resolved in 2011, almost a decade after the Decedent's death.

**III.    CONCLUSION**

        Because the record taken as a whole could not lead a rational trier of fact to find that Debtor either desired to bring about Oliva's death as a result of her conduct or was substantially certain that Oliva's death would result from her conduct, this Court concludes as a matter of law that Debtor's unliquidated debt in any wrongful-death action is not "for willful . . . injury." § 523(a)(6). Plaintiff's debt is therefore dischargeable and the Motion for Summary Judgment will be granted.  Counsel for the Debtor is to submit a form of Order in accordance with this Memorandum Opinion.

                                       BY THE COURT:

                                       Honorable Gloria M. Burns
                                       United States Bankruptcy Judge

Dated:   July 18, 2012